ZAHIRA LINETTE MARTÍNEZ VÁZQUEZ, demandante recurrida, *v.* NELSON RODRÍGUEZ LAUREANO, demandado peticionario.

*Número:* CC-2003-172    *Resuelto:* 13 de agosto de 2003

*María S. González Rodríguez* y *Jorge A. Rotger Reyes*, del *Bufete Rotger y González*, abogados del peticionario; *Wilma I. Cadilla Vázquez*, abogada de la recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El 20 de diciembre de 2002 la Sra. Zahira Linette Martínez Vázquez, aquí recurrida, presentó una demanda de

divorcio contra su esposo, el Sr. Nelson Rodríguez Laureano, ante el Tribunal de Primera Instancia, Sala Superior de Caguas. En esa misma fecha la señora Martínez Vázquez presentó una solicitud urgente de alimentos, en la cual pedía al tribunal que impusiera al demandado la obligación de proveer —a ésta y al hijo de cuatro años habido en el matrimonio de ambos— una pensión alimentaria provisional mientras se dilucidaba la pensión final correspondiente.

La vista ante el examinador de pensiones alimentarias se celebró el 8 de enero de 2003. En ésta se suscitó una *controversia* en cuanto a la forma correcta de calcular el ingreso neto del demandado, *específicamente en cuanto a si debía descontarse de su ingreso bruto la aportación que éste hace al plan de retiro provisto por su patrono, la empresa Popular Auto Inc.* El demandado sostuvo ante el oficial examinador que esta deducción era *mandatoria por ley*, pues era una de las enumeradas en el Art. 2(17) de la Ley Orgánica de la Administración para el Sustento de Menores (Ley de Sustento de Menores), Ley Núm. 5 de 30 de diciembre de 1986 (8 L.P.R.A. sec. 501 *et seq.*).

El oficial examinador se negó a acoger dicho planteamiento al señalar que tal deducción sólo era aplicable a empleados públicos y no a empleados de empresas privadas. El examinador resolvió que la deducción por concepto de planes de retiro sólo puede ser considerada en los casos en que dicha pensión sea obligatoria por ley. Adujo el referido funcionario que, a diferencia de lo que ocurre con la mayoría de los empleados públicos, para los que laboran en empresas privadas el plan de retiro es voluntario; es decir, no existe ley alguna que obligue a estos empleados a acogerse a un plan de retiro. Basado en ello, dispuso que este descuento no podía considerarse como una "deducción mandatoria" para computar el ingreso neto del alimentante, quien laboraba para una empresa privada.

Finalmente, y sin considerar el descuento del plan de retiro del peticionario, el examinador emitió su informe en el cual recomendó que se fijara una pensión alimentaria provisional de cuatrocientos sesenta y nueve dólares mensuales, retroactivo a la fecha de presentación de la solicitud de pensión.(1) Además, dispuso que el padre alimentante debía sufragar el 70% del pago de la matrícula escolar del menor. A raíz del informe, el tribunal de instancia emitió una resolución el 14 de enero de 2003, mediante la cual fijó una pensión alimentaria provisional por la suma recomendada por el oficial examinador.

Por entender que la cuantía de la pensión provisional impuesta había sido determinada incorrectamente, el 22 de enero de 2003 el señor Rodríguez Laureano presentó ante el foro de instancia un escrito titulado Moción Solicitando se Ajuste la Pensión Alimentaria Provisional Impuesta en Consideración a una Deducción Mandatoria No Considerada, en la cual solicitaba la modificación de ésta. Alegó, en síntesis, que la deducción por concepto de planes de retiro era mandatoria según lo dispuesto en la Ley de Sustento de Menores, específicamente en su Art. 2(17), 8 L.P.R.A. sec. 501(17). Adoptando las determinaciones y recomendaciones del examinador, el 5 de febrero de 2003 el Tribunal de Primera Instancia emitió una resolución mediante la cual declaró "no ha lugar" la referida moción.

Así las cosas, el 7 de marzo de 2003 el demandado acudió, mediante el correspondiente recurso y moción en auxilio de jurisdicción, ante el Tribunal de Circuito de Apelaciones. Solicitó del tribunal apelativo intermedio que emitiera una orden que paralizara los procedimientos ante el tribunal de instancia hasta tanto emitiera algún dictamen con respecto a la procedencia o no de la deducción por concepto de planes de retiro. El foro apelativo intermedio

---

(1) El mismo día de la vista el demandado le entregó a la demandante la suma de cuatrocientos veintitrés dólares ($423) para satisfacer la deuda generada hasta ese momento en virtud de la pensión retroactiva.

denegó tanto la referida moción en auxilio de su jurisdicción como la expedición del auto solicitado.

Inconforme con tal proceder, el 10 de marzo de 2003 el señor Rodríguez Laureano acudió ante este Tribunal, vía recurso de *certiorari* y moción en auxilio de nuestra jurisdicción. En el recurso que presentara el peticionario le imputa al foro apelativo haber errado al denegar el recurso de *certiorari* solicitado, sosteniendo así la determinación del foro de instancia de no considerar como deducción la aportación al plan de retiro del peticionario al momento de establecer el ingreso neto de éste.

Mediante resolución emitida ese mismo día, ordenamos la paralización de los procedimientos ante el tribunal de instancia hasta que otra cosa dispusiéramos.[2] Además, concedimos a la parte demandante recurrida, Zahira Linette Martínez Vázquez, el término de quince días para mostrar causa por la cual este Tribunal no debía expedir el recurso de *certiorari* presentado y dictar sentencia revocatoria de la resolución emitida en el presente caso por el Tribunal de Primera Instancia. Contando con la comparecencia de ambas partes, y estando en posición de resolver el recurso presentado, procedemos a así hacerlo.

## I

■ En innumerables ocasiones hemos señalado que los casos de alimentos, en específico los relativos a menores de edad, están revestidos del más alto interés público.[3]

---

[2] El 20 de marzo de 2003 la señora Martínez Vázquez sometió ante este Tribunal una moción en la que solicitó que dejáramos sin efecto la orden de paralización de los procedimientos en auxilio de jurisdicción. Habiendo examinado el referido escrito, *modificamos* la Resolución previamente emitida para disponer que el demandado peticionario, Nelson Rodríguez Laureano, debía continuar pasando la cantidad de doscientos treinta y cinco dólares quincenales por concepto de pensión alimentaria provisional, hasta tanto resolviéramos el recurso presentado.

[3] Véanse, entre otros: *Argüello v. Argüello*, 155 D.P.R. 62 (2001); *Figueroa Robledo v. Rivera Rosa*, 149 D.P.R. 565 (1999); *Galarza Rivera v. Mercado Pagán*, 139 D.P.R. 619 (1995); *Rodríguez Sanabria v. Soler Vargas*, 135 D.P.R. 779 (1994); *Rodríguez Rosado v. Zayas Martínez*, 133 D.P.R. 406 (1993); *Robles v. Otero de*

Dicho interés es de categoría suprema que se fundamenta, entre otros, en los principios de solidaridad humana y en los derechos fundamentales del ser humano. R. Serrano Geyls, *Derecho de familia de Puerto Rico y legislación comparada*, San Juan, Ed. Programa de Educación Jurídica Continua de la Universidad Interamericana de Puerto Rico, 2002, Vol. II, pág. 1413. A esos efectos, hemos señalado que, respecto a los menores de edad, el derecho de éstos a recibir alimentos "es parte esencial del principio natural de conservación que ... constituye una piedra angular del derecho constitucional a la vida". *Chévere v. Levis*, 150 D.P.R. 525, 535 (2000).

Esta obligación surge de la relación paterno-filial que se origina en el momento en que la paternidad o maternidad queda establecida legalmente.([4]) *Chévere v. Levis*, ante, pág. 539. Es un deber que

> ... existe por un derecho natural a percibir alimentos que simplemente ha sido formalizado por el legislador convirtiéndola en derecho positivo y vigente y, por otro lado, creando en el ánimo del obligado el deber de proporcionarlos independientemente de su voluntad de cumplir. P.F. Silva-Ruiz, *Alimentos para menores de edad en Puerto Rico: las guías mandatarias, basadas en criterios numéricos, para la determinación y modificación de pensiones alimenticias*, 52 (Núm. 2) Rev. C. Abo. P.R. 109, 112 (1991).

■ Podemos afirmar que la obligación de alimentar no sólo es un deber moral, sino que, además, se trata de un

---

*Ramos*, 127 D.P.R. 911 (1991); *López v. Rodríguez*, 121 D.P.R. 23 (1988); *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61 (1987); *Quiñones v. Jiménez Conde*, 117 D.P.R. 1 (1986); *Rodríguez Avilés v. Rodríguez Beruff*, 117 D.P.R. 616 (1986); *Martínez v. Rivera Hernández*, 116 D.P.R. 164 (1985); *Otero Fernández v. Alguacil*, 116 D.P.R. 733 (1985).

([4]) Una vez se establece legalmente tal filiación, el padre y la madre tienen la obligación de prestar alimentos a sus hijos menores, independientemente de que tengan o no la patria potestad, o que vivan o no en compañía del menor. *Chévere Mouriño v. Levis Goldstein*, 152 D.P.R. 492 (2000); *Chévere v. Levis*, 150 D.P.R. 525 (2000).

deber jurídico que, en nuestra jurisdicción, ha sido consagrado en varios de los artículos de nuestro Código Civil.([5])

■ Tratándose de un derecho de tan alto interés público, el Estado, como parte de su política pública, ha legislado ampliamente para velar por su cumplimiento. En tal virtud fue que se aprobó la Ley Núm. 5 de 30 de diciembre de 1986 (8 L.P.R.A. sec. 501 *et seq.*), conocida como la Ley Orgánica de la Administración para el Sustento de Menores.([6]) Esta pieza legislativa tuvo el efecto de reformular la política pública del Estado al crear un procedimiento judicial expedito([7]) que brinda protección al mejor interés y bienestar del menor mediante trámites rápidos y eficientes de fijación, modificación y cobro de pensiones

([5]) A modo ilustrativo, podemos mencionar el Art. 153 (31 L.P.R.A. sec. 601), el cual dispone los deberes y las obligaciones de los padres en el ejercicio de la patria potestad, específicamente en lo que respecta a su deber de alimentar a sus hijos no emancipados; el Art. 143 (31 L.P.R.A. sec. 562), donde se regula lo concerniente a alimentos entre parientes, y el Art. 1308 (31 L.P.R.A. sec. 3661), el cual responsabiliza a la sociedad legal de gananciales respecto a los alimentos de los hijos comunes y de los de cualquiera de los cónyuges. Además, podemos mencionar el Art. 158 de nuestro Código Penal, 33 L.P.R.A. sec. 4241, el cual constituye otra de las fuentes estatutarias que sirven de base al derecho alimentario en la medida en que establece sanciones para aquellos padres o madres que incumplen —voluntariamente y sin excusa legal— la obligación de proveer alimentos a sus hijos menores de edad.

([6]) En cuanto a la política pública del Estado, en el Art. 3 de la Ley, 8 L.P.R.A. sec. 502, se dispuso lo siguiente:

"Se declara que es política pública del Estado Libre Asociado de Puerto Rico procurar que los padres o las personas legalmente responsables contribuyan, en la medida en que sus recursos lo permitan, a la manutención y bienestar de sus hijos o dependientes mediante el fortalecimiento de los sistemas y la agilización de los procedimientos administrativos y judiciales para la determinación, recaudación y distribución de las pensiones alimentarias. Las disposiciones de este capítulo se interpretarán liberalmente a favor de los mejores intereses del menor o alimentista que necesita alimentos."

([7]) Se trata de un trámite procesal sumario que comienza con la presentación de la reclamación alimentaria. En ese momento la secretaría del tribunal expide una notificación-citación de vista que se diligencia en la persona del alimentante. Luego se celebra una vista ante el examinador, quien presenta su informe al juez que finalmente provee sobre las recomendaciones recibidas. S. Torres Peralta, *La ley especial de sustento de menores de 1994 y el derecho de alimentos en Puerto Rico*, ed. especial, San Juan, Publicaciones S.T.P., 1997, pág. 4.3; 8 L.P.R.A. secs. 511 y 514. Véase, además, R. Serrano Geyls, *Derecho de familia de Puerto Rico y legislación comparada*, San Juan, Ed. Programa de Educación Jurídica Continua de la Universidad Interamericana de Puerto Rico, 2002, Vol. II, págs. 1498–1499.

alimentarias.[8] R. Ortega-Vélez, *Compendio de Derecho de Familia*, San Juan, Ed. Publicaciones JTS, 2000, T. II, pág. 567. A pesar de que a través de los años esta ley ha sufrido varias enmiendas, en todo momento se ha conservado la política pública de proveer para que "los padres o las personas legalmente obligadas asuman la responsabilidad que tienen para con sus hijos".[9]

En lo que respecta a la cuantía de la pensión que el alimentante deberá pagar al alimentista, debe señalarse que el Art. 146 del Código Civil, 31 L.P.R.A. sec. 565, dispone que ésta deberá ser proporcional a los recursos del que los da y a las necesidades del que los recibe, y se reducirá o aumentará en proporción a los recursos del primero y las necesidades del segundo. A tales efectos, se ha señalado que tal determinación debe ser realizada en consideración a dos criterios principales, a saber: (i) los recursos y medios de fortuna del alimentante, de forma tal que se pueda determinar su capacidad económica para cumplir con su obligación alimentaria y (ii) las necesidades del alimentista, es decir, cuánto necesita éste para cubrir sus necesidades de sustento, habitación, vestido, asistencia médica y educación, conforme su posición social. S. Torres Peralta, *La nueva Ley Especial de Sustento de Menores y el derecho a pensión alimenticia*, 49 (Núms. 3–4) Rev. C. Abo. P.R. 17, 19 (1988); Art. 146 del Código Civil, ante.

Este criterio de proporcionalidad que adopta nuestro Código también lo observamos en la Ley de Sustento de Menores y en las Guías para Determinar y Modificar Pensiones Alimentarias en Puerto Rico (Guías), Departamento de Servicios Sociales, Reglamento Núm. 4070 de 8 de di-

[8] En 1994, mediante la aprobación de la Ley Núm. 86 de 17 de agosto de 1994, se estableció un procedimiento administrativo que opera paralelamente al judicial.

[9] Exposición de Motivos, Ley Núm. 5 de 30 de diciembre de 1986, Leyes de Puerto Rico, pág. 750.

ciembre de 1989.([10]) Es decir, de acuerdo con lo que disponen estas guías, al determinar la cuantía de la pensión no sólo se evalúa la situación económica del alimentante, sino que, además, se analizan las necesidades particulares del alimentista.

■ Refiriéndonos específicamente al asunto de la capacidad económica del alimentante, precisa que evaluemos lo dispuesto en la Ley de Sustento de Menores, en cuanto a los criterios que deben ser utilizados para determinar el montante de los recursos del alimentante. Nos referimos a los *conceptos "ingreso" e "ingreso neto"*, los cuales son definidos en la referida ley y utilizados en las Guías para establecer la capacidad económica del alimentante. El primero de éstos —el concepto "ingreso"— ha sido definido en el Art. 2(16) de la Ley de Sustento de Menores, 8 L.P.R.A. sec. 501(16), como

> ... cualquier ganancia, beneficio, rendimiento o fruto derivado de sueldos, jornales o compensación por servicios personales, incluyendo la retribución recibida por servicios prestados como funcionario o empleado del Estado Libre Asociado de Puerto Rico, del Gobierno de los Estados Unidos de América, según lo permitan las leyes y reglamentos federales aplicables, de cualquier estado de la Unión de los Estados Unidos de América, o de cualquier subdivisión política de los mismos, o de cualquier agencia o instrumentalidad de cualesquiera de las mencionadas entidades en cualquiera que sea la forma en que se pagaren; o de profesiones, oficios, industrias, negocios, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso del interés en tal propiedad; también los derivados de intereses, rentas, dividendos, beneficios de sociedad, valores o la operación de cualquier negocio explotado con fines del lucro o utilidad; y ganancias, beneficios, rendimientos, fondos, emolumentos o compensación derivados de cualquier procedencia, incluyendo compensaciones como contratista independiente, compensaciones por desempleo, compensaciones por incapacidad, bene-

---

([10]) Estas guías están basadas en criterios numéricos y descriptivos, y deben ser utilizadas en todo caso en que se solicite la fijación o modificación de pensiones alimentarias.

ficios de retiro y pensiones o cualquier otro pago que reciba un alimentante de cualquier persona natural o jurídica.[11]

Por su parte, y esta vez en el inciso (17) de su Art. 2 (8 L.P.R.A. sec. 501(17)), la Ley de Sustento de Menores define lo que se considerará como "ingreso neto", para propósitos de la fijación de una pensión alimentaria, como

[a]quellos ingresos disponibles al alimentante, luego de las deducciones por concepto de contribuciones sobre ingresos, seguro social y *otras requeridas mandatoriamente por ley. Se tomarán en consideración, además, a los efectos de la determinación del ingreso neto, las deducciones por concepto de planes de retiro*, asociaciones, uniones y federaciones voluntarias, así como los descuentos o pagos por concepto de primas de pólizas de seguros de vida, contra accidentes o de servicios de salud *cuando el alimentista sea beneficiario de éstos*. La determinación final se hará según toda la prueba disponible, incluyendo estimados, estudios y proyecciones de ingresos, gastos, estilo de vida y cualquier otra prueba pertinente. (Énfasis suplido.)

A tono con lo anterior, en la Sec. 5 de las Guías, ante, pág. 6, se establece que

[s]e considera[rá] ingreso neto disponible, aquella parte del ingreso bruto, que luego de descontársele las deducciones mandatorias *y otras deducciones aceptadas*, queda disponible para hacer frente al pago de las pensiones alimenticias. (Énfasis suplido.)

---

[11] Adviértase que el alcance del concepto "ingreso" es sumamente amplio y extenso, lo cual evidencia la intención del legislador de que en la determinación de la capacidad económica del alimentante se consideren todas las fuentes concebibles de las cuales el alimentante derive ingresos. S. Torres Peralta, *La nueva Ley Especial de Sustento de Menores y el derecho a pensión alimenticia*, 49 (Núms. 3–4) Rev. C. Abo. P.R. 17, 95 (1988).

A tales efectos hemos resuelto que "la determinación de la cuantía de los alimentos corresponde al prudente arbitrio de los tribunales, teniendo en cuenta que haya proporción entre el estado de necesidad del alimentista y la posibilidad económica del alimentante". *Guadalupe Viera v. Morell*, 115 D.P.R. 4, 14 (1983). Esto es, al determinar la capacidad económica de un alimentante los tribunales no están limitados a considerar únicamente la evidencia testifical y documental, sino que pueden considerar, además, aspectos tales como el estilo de vida que lleva el alimentante, su capacidad para generar ingresos, la naturaleza y cantidad de propiedades con que cuenta, la naturaleza de su empleo o profesión y sus otras fuentes de ingreso. A base de la prueba circunstancial que se le someta, el tribunal puede inferir que el alimentante cuenta con medios suficientes para cumplir con la obligación alimentaria que se le imponga. *López v. Rodríguez*, 121 D.P.R. 23, 33 (1988).

La frase "deducciones mandatorias" es definida en la Sec. 2 de las Guías, ante, pág. 5, como "aquellas deducciones del salario bruto de una persona que por ley se requieren en el desempeño de su trabajo".

De particular pertinencia y relevancia al caso ante nuestra consideración es el Informe Conjunto emitido por las Comisiones de lo Jurídico, de Hacienda y del Gobierno Estatal al Senado de Puerto Rico sobre el sustitutivo del P. del S. 413, eventualmente convertido en la Ley Núm. 106 de 12 de julio de 1985, Leyes de Puerto Rico, pág. 384 (predecesora de la Ley de Sustento de Menores y donde, por primera vez, se incluyeron las definiciones de "ingreso" e "ingreso neto" que actualmente figuran en la ley vigente). En este informe se dispuso, entre otras cosas, que

> ... aquellas deducciones del salario o de los ingresos a que voluntariamente se acoge una persona, tales como las cuotas de asociaciones, pólizas de seguro de vida, contra accidentes o de servicios de salud, *al igual que las correspondientes a un plan de retiro* de pensiones; sólo se tomarán en consideración para determinar el ingreso neto cuando el menor con derecho a recibir alimentos en alguna medida sea beneficiario de las mismas. (Énfasis suplido.) P. del S. 413 de 12 de julio de 1985, 1ra Sesión Ordinaria, 10ma Asamblea Legislativa, págs. 5–6.

De las disposiciones anteriormente transcritas se desprende el proceso evaluativo que debe ser realizado para establecer la capacidad económica del alimentante. En primer lugar, deberá determinarse lo que ha sido llamado en las Guías como el "ingreso bruto", lo cual conlleva el análisis de todas las posibles fuentes de ingreso con las que cuenta el alimentante. Una vez realizado este análisis, entonces deberá determinase el ingreso neto, que es el punto de partida para la fijación de la pensión alimentaria.[12]

Para calcular este "ingreso neto" deberán considerarse

---

[12] Según lo dispuesto en el Art. 19 de la Ley de Sustento de Menores, 8 L.P.R.A. sec. 518, además del ingreso neto del alimentante, deberá considerarse su capital o patrimonio total.

las deducciones que han sido enumeradas en el Art. 2(17) de la Ley de Sustento de Menores, ante. Según lo expuesto en este artículo, estas deducciones son: contribuciones sobre ingreso, seguro social y otras requeridas mandatoriamente por ley. Además se mencionan los descuentos o pagos por concepto de *planes de retiro*, asociaciones, uniones, federaciones voluntarias, primas o pólizas de seguros de vida, contra accidentes, o de servicios de salud. Es importante señalar que estos últimos, descritos como "voluntarios" en el Informe Conjunto previamente citado, sólo podrán ser descontados del ingreso bruto en aquellos casos en que el alimentante logre demostrar que el menor con derecho a recibir alimentos, en alguna medida, se beneficia de éstos. Naturalmente, este asunto deberá ser objeto de prueba.

Dentro del marco doctrinal previamente esbozado es que debemos evaluar si en el presente caso procede deducir de los ingresos del alimentante, para establecer el monto de su ingreso neto, las sumas aportadas por éste a un plan de retiro, aun cuando no exista ningún mandato de ley que exija la participación del empleado en dicho plan. Veamos.

## II

Tal y como señaláramos previamente, en el caso de autos el foro de instancia se negó a considerar, a los efectos de determinar el ingreso neto del demandante, la deducción del plan de retiro que éste tiene en su empleo, por entender que ésta no era de las "requeridas mandatoriamente por ley", pues, según explicó, no existe ninguna ley que le exija a los empleados de empresas privadas que aporten a un plan de retiro. Según dispuso, "un empleado de empresa privada escoge voluntariamente su retiro [lo cual indica que] no es mandatorio por ley que para retener su puesto tenga que obligatoriamente aportar al plan de retiro". Apéndice, pág. 13.

158

Ya hemos expresado que la Ley de Sustento de Menores dispone que para determinar el ingreso neto del alimentante deben tomarse en consideración las deducciones enumeradas en el citado Art. 2(17) del estatuto.[13] A pesar de que en el referido artículo encontramos, *expresamente enumerada*, la deducción por concepto de pensiones de retiro, hoy nos corresponde determinar si, para establecer el ingreso neto del padre o madre alimentante, es necesario que ésta sea "requerida mandatoriamente por ley" o si, por el contrario, puede ser considerada, aun cuando se trate de un plan de retiro al que el alimentante haya ingresado voluntariamente. Para ello precisa que analicemos detenidamente lo dispuesto en el referido artículo, teniendo presente el principio jurídico plasmado en el Art. 14 de nuestro Código Civil, 31 L.P.R.A. sec. 14, a los efectos de que "cuando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Veamos.

De entrada debemos señalar que en la segunda oración de la disposición bajo análisis el legislador *expresó claramente* que

> [s]e tomarán en consideración, *además*, a los efectos de la determinación del ingreso neto, las deducciones por concepto de *planes de retiro*, asociaciones, uniones y federaciones voluntarias, así como los descuentos o pagos por concepto de primas de pólizas de seguros de vida, contra accidentes o de servicios de salud *cuando el alimentista sea beneficiario de éstos*. (Énfasis suplido.) 8 L.P.R.A. sec. 501(17).

Como vemos, del propio texto de la disposición transcrita surge la única interpretación plausible en el presente caso: las deducciones que aquí se detallan serán considera-

---

[13] De este modo se obtiene el ingreso que más fielmente representa la habilidad económica del alimentante para sufragar los gastos del alimentista. P.F. Silva-Ruiz, *Alimentos para menores de edad en Puerto Rico: las guías mandatorias basadas en criterios numéricos, para la determinación y modificación de pensiones alimenticias*, citando a E. Ruiz Torres, *Modelo para fijar pensiones alimenticias en Puerto Rico: informe final, (Diciembre 1987)*, 52 (Núm. 2) Rev. C. Abo. P.R. 109, 128 (1991).

das *"además"* de las mencionadas en la oración que le precede. Se trata, pues, de un listado taxativo, *adicional e independiente al que se incluyó en la primera parte del citado Art. 2(17)*, donde *no* se menciona el requisito del mandato legal al que hace alusión el foro de instancia.

■ Del propio texto de la Ley de Sustento de Menores surge que el legislador optó por detallar *otras* deducciones —adicionales a las "requeridas mandatoriamente por ley"— que no necesariamente deberán estar contenidas en disposición legal alguna para que puedan ser tomadas en consideración al momento de calcular el ingreso neto del padre o madre alimentante; ello, claro está, siempre que el menor se beneficie de éstas. Dicho de otro modo, las deducciones que se mencionan en el segundo párrafo de este Art. 2(17), ante, deben ser consideradas para establecer el ingreso neto del padre o madre alimentante *independientemente* de que sean o no requeridas por ley en el desempeño de su empleo. Adviértase que a esta misma conclusión nos lleva el análisis del historial legislativo de la citada ley.

La única condición que se impone para considerar las deducciones allí dispuestas es que el alimentista se beneficie de éstas, lo cual, como señaláramos, deberá ser objeto de prueba. Siendo así, es evidente que no podemos, en nuestra función interpretativa, añadir condiciones o restricciones que no fueron contempladas por el legislador al momento de promulgar la legislación bajo análisis. Hemos expresado en innumerables ocasiones que cuando la letra de una ley no tiene ambigüedades y su lenguaje es claro y sencillo, como en efecto ocurre en el caso de autos, los tribunales *no* están autorizados a adicionarle limitaciones o restricciones que no aparezcan en su texto. *Com. Pro Perm. Bda. Morales v. Alcalde*, 158 D.P.R. 195 (2002); *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 688 (1966); *Meléndez v. Tribunal Superior*, 90 D.P.R. 656, 660–661 (1964). El alcance de un estatuto no podrá ser restringido interpretándolo como que provee algo que el legislador no

intentó proveer. Ello equivaldría a invadir las funciones de la Asamblea Legislativa. *Juarbe v. Registrador*, 156 D.P.R. 387 (2002); *Caguas Bus Line v. Sierra*, 73 D.P.R. 743, 750 (1952).

Lo antes expuesto es suficiente para concluir que, en el caso específico de lo dispuesto en la segunda oración del Art. 2(17), ante, el legislador se refería a aquellas deducciones a las cuales el alimentante se hubiese acogido *voluntariamente* y *no* a aquellas que fueran requeridas por mandato de ley.[14] Contrario a lo resuelto por el Tribunal de Primera Instancia en el caso de marras, vemos que en ninguna parte del estatuto, ni siquiera en su historial legislativo, se menciona el hecho de que la deducción por concepto de plan de retiro que se incluye en este artículo está limitada exclusivamente a aquellos alimentantes que ostentan empleos públicos.[15]

Otro fundamento que abona a nuestra conclusión surge de lo dispuesto en la Sec. 5 de las Guías, ante, a los efectos de que se considerará como "ingreso neto" aquella parte del ingreso bruto que queda disponible "luego de descontársele las deducciones mandatorias *y otras deducciones aceptadas*". Como vemos, también en las Guías se ha hecho una distinción *clara y expresa* entre las "deducciones mandatorias" y las "otras deducciones aceptadas". Ello fortalece nuestra conclusión a los efectos de que las deducciones enumeradas en la segunda oración del artículo bajo análisis pueden ser descontadas al momento de calcular el ingreso neto del alimentante, *irrespectivamente* de que exista o no una ley que las imponga.

█   A la luz de los pronunciamientos previamente es-

---

[14] Como hemos visto, estas últimas ya estaban contempladas en la primera oración de la disposición bajo análisis.

[15] Ciertamente este argumento carece de todo sentido lógico, pues la ley que dispuso que los empleados del Estado Libre Asociado debían ingresar obligatoriamente al plan de retiro del Gobierno (Ley Núm. 3) fue aprobada el 13 de febrero de 1996, (Parte 1) Leyes de Puerto Rico 4; esto es, a 11 años de la aprobación de la Ley Especial de Sustento de Menores, 8 L.P.R.A. sec. 501 *et seq.*

bozados, *resolvemos* que para considerar la deducción por concepto de plan de retiro, a los efectos de calcular el ingreso neto de un padre o madre alimentante, *no será necesario* que dicho plan haya sido impuesto mandatoriamente por una ley como requisito para obtener o mantener un empleo.[16] *La única condición para tal deducción será que el menor con derecho a recibir alimentos, en alguna medida, se beneficie o pueda beneficiarse de ésta.*

■　　Una correcta interpretación y aplicación de nuestro ordenamiento jurídico *no* puede llevarnos a otra conclusión. Resolver lo contrario necesariamente conllevaría establecer una distinción entre "empleado público" y "empleado privado" *que el legislador definitivamente no contempló al momento de promulgar la legislación bajo estudio.* Ya hemos señalado que las pensiones de retiro constituyen seguros de dignidad para que las personas que hayan dedicado al trabajo productivo sus años fecundos no tengan que encontrarse en la etapa final de su vida en el desamparo o convertido en carga de parientes o del Estado. *Carrero Quiles v. Santiago Feliciano*, 133 D.P.R. 727 (1993); *Rosa Resto v. Rodríguez Solis*, 111 D.P.R. 89, 92 (1981).

Naturalmente, esto es así no sólo para los empleados públicos, sino también para aquellos que laboran en la empresa privada. Como bien expresa la Prof. Sarah Torres Peralta, no cabe duda que tal deducción está plenamente justificada, pues los planes de retiro, sean del Estado o sean de la empresa privada, son de especial importancia en esta época. S. Torres Peralta, *La Ley Especial de Sustento de Menores de 1994 y el derecho de alimentos en Puerto Rico*, ed. especial, San Juan, Publicaciones S.T.P., 1997, pág. 2.10. A tales efectos señala la profesora Torres Peralta que "[d]ebe recordarse que es política pública el promover

---

[16] Naturalmente, dicho mandato *tampoco* será necesario para las otras seis deducciones que se mencionan en esta segunda oración del Art. 2(17), 8 L.P.R.A. sec. 501(17).

los mismos y conservar los derechos del beneficiario de dicho plan sin poner en peligro su participación en el mismo". Íd.

■ No hay duda de que resulta incomprensible y hasta repugnante la actitud de regateo que asumen muchos padres respecto al pago de las pensiones alimentarias de sus hijos. *Valencia, Ex parte*, 116 D.P.R. 909 (1986). En tal virtud hemos resuelto que

> ... allí donde se demuestre que la falta de pago de las referidas pensiones es producto del capricho y la arbitrariedad, los tribunales deben ser fuertes y rigurosos en lograr que dichos padres cumplan con su deber. Íd., pág. 912.

Sin embargo, también hemos expresado que

> [e]l hecho de que la experiencia nos demuestra que en la mayoría de los casos las negativas de pagar estas pensiones desafortunadamente son hijas de la arbitrariedad, no puede llevar a los tribunales al establecimiento de reglas inflexibles y férreas a ser aplicadas en todos los casos por igual. Íd.

Ciertamente,

> [e]l automatismo y absolutismo no tienen cabida en los procedimientos judiciales de nuestro ordenamiento jurídico. El propósito primordial que anima todos los esfuerzos de los funcionarios envueltos en esta delicada misión —la de hacer justicia— así no lo permite. Íd., págs. 912–913.

Luego de haber examinado y estudiado exhaustivamente el expediente del presente caso, estamos totalmente convencidos de que el caso de autos *no* trata sobre un padre que arbitraria y maliciosamente ingresó a un plan de retiro con el propósito de disminuir sus ingresos y, por consiguiente, afectar la cuantía de la pensión alimentaria de su hijo.[17] Todo lo contrario. En el caso de marras el Sr.

---

[17] Esta fue precisamente la premisa mayor en que el foro de instancia apoyó su dictamen. Dicho foro, haciendo suyos los pronunciamientos del oficial examinador,

Nelson Rodríguez Laureano ingresó al plan de retiro que ofrecía su patrono casi un año antes de contraer matrimonio. De los autos surge que cuando Rodríguez estaba soltero aportaba el diez porciento de su salario al plan de retiro y tenía como beneficiarios a su padre y madre. *Sin embargo, al contraer matrimonio, éste cambió los beneficiarios de dicho plan para que ya no fueran sus padres, sino su esposa y su hijo.* Además, y a consecuencia de las nuevas responsabilidades económicas incurridas a raíz de su nuevo matrimonio, Rodríguez Laureano decidió disminuir la aportación que hacía al plan de retiro de un 10% al 8% que en la actualidad aporta.

De lo antes expuesto surge claramente que el interés del señor Rodríguez Laureano en obtener un seguro para su retiro surgió mucho tiempo antes de contraer nupcias, cuando ni siquiera tenía hijos que mantener. *Sin embargo, una vez convertido en padre, éste incluyó a su hijo y a su esposa como beneficiarios de dicho plan,* lo cual evidencia que, a pesar de preocuparse por su retiro, éste nunca olvidó sus funciones como padre.([18])

*Como vemos, en el caso de autos se cumple con el único requisito que impone el Art. 2(17) de la Ley de Sustento de Menores, ante, para que pueda descontarse del ingreso bruto del alimentante las aportaciones que éste hace a un plan de retiro: que el alimentista figure como beneficiario de dicho plan.* Siendo así resulta forzoso concluir que erró el foro de instancia al negarse a considerar tal deducción al momento de calcular el ingreso neto del señor Rodríguez Laureano.

---

dispuso que "si se permitiera lo que el padre pretende, permitiría el que un padre invirtiera en su fondo de retiro la cantidad que él decida, con el efecto final de reducir la pensión alimentaria de sus hijos". Apéndice, pág. 13.

([18]) Resulta meritorio mencionar, además, que el señor Rodríguez Laureano *voluntariamente* continuó pagando las mensualidades de la hipoteca de la casa en que viven su esposa y su hijo, aun después de que el foro de instancia emitiera su dictamen con relación a la pensión provisional impuesta.

## III

En mérito de lo antes expuesto, *se expide el auto de "certiorari" presentado por el peticionario, se revoca la resolución emitida por el Tribunal de Primera Instancia y se devuelve el caso a dicho foro judicial para procedimientos ulteriores compatibles con lo aquí resuelto.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión disidente.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

La mayoría del Tribunal emite una decisión en el caso de autos que tiene el efecto de permitir que un padre pueda burlar sustancialmente la más fundamental obligación que éste tiene de alimentar a sus hijos conforme a sus medios de fortuna.

Debe notarse, antes que nada, que en el caso de autos estaba involucrado un plan *privado* de retiro, escogido *voluntariamente* por el peticionario. No se trata de un plan de retiro gubernamental de los que son obligatorios para empleados públicos. En lo que aquí nos concierne, existe una diferencia fundamental entre el plan privado y el plan gubernamental. Éste se estructura sin que intervenga de modo alguno en su diseño la persona que pertenece al plan, *que es el mismo* para dicha persona y para muchos miles más, y que para su financiamiento se le exige al empleado *unas aportaciones relativamente limitadas.* El plan privado, en cambio, se estructura en gran medida según lo interese la persona que se suscribe al plan. En aspectos muy importantes, el plan privado es hecho a la medida del

que lo compra, y su alcance está estrechamente ligado al monto de las aportaciones que éste hace.

Según lo que resuelve la mayoría aquí, un padre ahora podrá invertir en un fondo *voluntario privado* para *su propio retiro* la cantidad que le plazca de sus ingresos y esa cantidad podrá deducirse de los fondos que éste debe tener disponibles para cumplir con el sagrado deber de alimentar a sus hijos. El mal padre puede reducir así, según le plazca, los fondos que de otro modo tendrían que destinarse para la pensión alimentaria de sus hijos.

La mayoría resuelve que la deducción referida es legítima si los hijos figuran como beneficiarios del plan privado de retiro del padre. Lo que la mayoría sorpresivamente no pondera de modo alguno es que el propósito del plan aludido *no es* proveerles beneficios a los hijos, sino al propio padre cuando le llegue el momento de jubilarse. *El plan de retiro del padre no es primordialmente un seguro de vida a favor de los hijos.* Se trata más bien de un plan diseñado específicamente para que el que aporta al plan —el padre— tenga asegurado unos ingresos al momento de jubilarse, *cuyo monto depende precisamente de cuánto éste aporte voluntariamente al fondo en cuestión.* Estos planes de retiro de ordinario tienen una disposición para la eventualidad de que el que aporta al plan fallezca antes de jubilarse. En tal eventualidad los fondos aportados van a quien se designe. Pero todo el entramado del plan se basa en que tal eventualidad *no ocurrirá.* El elemento medular del plan es que el que aporta llegará a jubilarse y así podrá disfrutar de lo que aportó, más sus frutos. Por ello, los designados para recibir los fondos aportados en el caso extremo del fallecimiento del que aporta, no son ni habrán de ser realmente beneficiarios del plan. La expectativa principal con respecto al plan de retiro es específicamente que la persona suscrita al plan no habrá de fallecer antes de jubilarse.

Dicho de otra forma, los que son designados como "beneficiarios" para el caso de un prematuro fallecimiento *de ordinario no habrán de beneficiarse en nada del plan.* No es para ellos que el plan existe. Existe para el que aporta al plan, quien mientras más aporte, más tendrá para su propio beneficio al momento de jubilarse. Cuando el legislador dispuso en la Ley Orgánica de la Administración para el Sustento de Menores, 8 L.P.R.A. sec. 501 *et seq.*, que para determinar el ingreso neto del alimentante se podrán considerar ciertas deducciones que benefician al alimentista, se refería a beneficios reales y concretos, no a "beneficios" especulativos o que ocurren por casualidad, como los del caso de autos.

Al no examinar la verdadera esencia de un plan de retiro como el de autos, la mayoría del Tribunal abre las puertas a que estos planes puedan servir de subterfugio al padre que desea menoscabar la obligación de alimentar a sus hijos. El padre que de veras quiere cumplir con este fundamental deber, no anda reclamando su aportación a su propio plan voluntario de retiro como una deducción a sus ingresos para limitar la pensión alimentaria que debe pagarle a sus hijos.

Como la mayoría ignora estas innegables realidades económicas y humanas, en detrimento claro del derecho de los hijos a ser alimentados por sus padres conforme a los medios de fortuna de éstos, yo disiento.