La Juez Asociada Señora Rodríguez Rodríguez
emitió la opi-nión del Tribunal.
El caso ante nuestra consideración presenta varias con-troversias relacionadas con el concepto “ingreso bruto” apli- *1008 cable en el contexto de la fijación de una pensión alimenticia para el beneficio de un menor alimentista. De una parte, tenemos la oportunidad de resolver si, en este contexto, constituye parte del ingreso bruto de la madre custodio: el dinero que ésta obtuvo por un préstamo hipotecario o el au-mento en el valor del inmueble con el que se garantizó esta obligación prestataria. Además, debemos resolver si —por disposición de las Guías para Determinar y Modificar Pen-siones Alimentarias en Puerto Rico de 1989— para estable-cer el ingreso bruto de un alimentante que trabaja “por cuenta propia”, deben restarse como gastos ordinarios y ne-cesarios aquellos deducibles para fines contributivos. En tercer lugar, debemos evaluar si procede intervenir con la partida de honorarios de abogado que el foro primario con-cedió en favor de las menores alimentistas.
Veamos los hechos que originan las controversias que están ante la consideración de este Tribunal.
I
El 4 de marzo de 1996, la señora Eileen Llorens Becerra (la señora Llorens) presentó una demanda para la recla-mación de alimentos en representación de sus dos hijas menores, las cuales procreó con el demandado, el Sr. Ilde-fonso Mora Monteserín (señor Mora). El 12 de diciembre de ese mismo año, el Tribunal de Primera Instancia fijó una pensión provisional de $800 mensuales, la cual sería efec-tiva desde el 1 de diciembre de 1996. Posteriormente, el tribunal modificó la pensión alimenticia provisional para aumentarla a $1,357.27. Esta modificación sería efectiva desde el 1 de diciembre de 1998.
Transcurridos casi diez años desde que se presentó la demanda, el 3 de noviembre de 2005, el Tribunal de Pri-mera Instancia dictó una sentencia parcial por estipula-ción de las partes. Mediante esta sentencia dispuso que, conforme a lo estipulado, quedaría satisfecha la obligación alimentaria del señor Mora para el periodo comprendido *1009 desde el 1 de enero de 2000. Tras emitirse la sentencia por estipulación, la controversia en el pleito quedó limitada a establecer la obligación alimentaria del señor Mora para el periodo comprendido desde el 4 de marzo de 1996 hasta el 31 de diciembre de 1999.
El foro primario celebró una vista evidenciaría, la cual se extendió por varios días, para recibir una prueba refe-rente a la controversia que quedó pendiente de adjudicar. En la vista sólo se presentó como testigo a la señora Llo-rens quien testificó, entre otros aspectos, sobre sus ingre-sos y los gastos personales de ella y sus hijas, según sur-gían de sus planillas de información personal y económica, y de las planillas de contribución sobre ingresos que pre-sentó desde 1996 hasta 1999. Particularmente, las plani-llas de contribución sobre ingresos fueron ofrecidas en evi-dencia, y admitidas por estipulación de las partes, a los efectos de que incluían los ingresos y gastos informados por la señora Llorens.
Surge de las planillas de contribución sobre ingresos, admitidas en evidencia, que para 1996 la señora Llorens informó que obtuvo un ingreso anual de $9,766 como em-pleada de American Airlines. Además, en el anejo corres-pondiente a los ingresos de industria o negocio, informó que obtuvo un ingreso anual de $2,836 producto de venta de ropa. En segundo lugar, para 1997 la señora Llorens informó los ingresos siguientes: $11,412 obtenido como em-pleada de American Airlines; $1,502 producto de la venta de ropa, y $11,180 de ganancia de capital por la venta de un inmueble. Para 1998, la señora Llorens informó el in-greso de $14,518 generado como empleada de American Airlines y el ingreso de $1,775 correspondiente al negocio de venta de ropa. Por último, para 1999, informó el ingreso de $15,260 obtenido como empleada de American Airlines y otro ingreso de $4,414 por ganancia de capital. Para este último año informó pérdidas de $1,132, en el negocio de venta de ropa.
*1010 Cabe mencionar que de los ingresos indicados, los infor-mados en relación con el negocio de venta de ropa consti-tuyen las ganancias calculadas por la señora Llorens, luego de que ésta dedujera ciertos gastos en los que alega incurrió para el manejo de su negocio. Entre las deduccio-nes informadas por la señora Llorens se encuentran parti-das de gastos sobre: vehículo de motor, reparaciones, co-mida y entretenimiento, anuncios, depreciación, servicios públicos como agua, luz y teléfono, materiales y otros gastos.
La representación legal del señor Mora inquirió, du-rante el contrainterrogatorio, sobre lo informado por la se-ñora Llorens en sus planillas de contribución sobre ingresos. Particularmente, cuestionó que la señora Llorens no reportara ingresos producto del arrendamiento de va-rios inmuebles de su propiedad. Por el contario, en las pla-nillas de contribución sobre ingresos de 1996 a 1999 la se-ñora Llorens reportó pérdidas en el anejo correspondiente a los ingresos por renta o alquiler.
En respuesta a las preguntas de la representación legal del señor Mora, la señora Llorens expuso que ello se debió a que los pagos de las contribuciones sobre la propiedad y de los préstamos hipotecarios, sumados a los gastos de ope-ración informados en las planillas de contribución sobre ingresos, excedían la renta que recibía por el arrenda-miento de sus propiedades. Afirmó que, aunque arrendó varias propiedades durante el periodo en cuestión, este arrendamiento le generaba pérdidas.
Entre los gastos de operación informados por la señora Llorens, en los anejos de las planillas de contribución sobre ingreso correspondientes al ingreso por renta, se encuen-tran partidas de gastos por: vehículos de motor, servicios públicos como agua, luz y teléfono, tapicería, jardinería, depreciación y amortización, contribuciones sobre la pro-piedad, mantenimiento, materiales, anuncios, seguros y otros gastos.
*1011 Luego de celebrar la vista, el 31 de mayo de 2006, el Tribunal de Primera Instancia dictó sentencia. Como parte de sus determinaciones, el foro primario estableció el in-greso neto del señor Mora y de la señora Llorens para los años en los que debía fijarse la pensión. Según lo estipu-lado por las partes, determinó que el ingreso neto mensual del señor Mora, para los años en controversia, fue el si-guiente:
1996 — $2,862.03
1997 — $4,155.89
1998 — $4,218.19
1999 — $5,901.33
De otra parte, el tribunal determinó que el ingreso neto mensual de la señora Llorens, para el mismo periodo, fue el siguiente:
1996 — $1,692.86
1997 — $8,268.25
1998 — $1,945.67
1999 — $2,688.56
Surge de la sentencia que, para calcular el ingreso neto mensual de la señora Llorens, el tribunal consideró el sa-lario que ésta devengó como empleada de la línea aérea American Airlines. A estos ingresos el foro primario le agregó los ingresos producto de la venta de ropa y del arrendamiento de sus propiedades.
Además de los ingresos mencionados, para calcular el ingreso neto mensual de 1997, el foro primario consideró $11,180 de ganancia de capital por la venta de un inmueble y “$72,000 capitalizado por [el] refínanciamiento de dos inmuebles”. (Enfasis suplido.)(1) Por otro lado, para 1999, *1012 el tribunal consideró como ingreso $4,414 de ganancias de capital por la venta de otra propiedad inmueble.
Cabe mencionar que en la sentencia sólo se estableció el ingreso neto mensual de la señora Llorens, sin especificar qué cantidad de éste correspondía al salario de American Airlines, a la venta de ropa y al arrendamiento de bienes inmuebles. No obstante, sí se pormenorizó la forma en que el tribunal calculó las partidas correspondientes a cada una de estas fuentes de ingreso.
En particular, se expuso que para calcular los ingresos obtenidos como resultado del negocio de venta de ropa, el tribunal de instancia consideró el “ingreso neto (sin gas-tos)” producto de ese negocio. Así, ese foro rechazó restar los gastos en los que la señora Llorens alega haber incu-rrido, según tales gastos fueron informados por ésta en sus planillas de contribución sobre ingresos.
De otra parte, para calcular los ingresos que la señora Llorens obtuvo del arrendamiento de sus propiedades, el foro primario restó las “deducciones” siguientes: contribu-ción sobre la propiedad, intereses hipotecarios, seguros y anuncios. Por el contrario, el Tribunal de Primera Instan-cia rechazó considerar los demás gastos que la señora Llo-rens informó en sus planillas de contribución sobre ingresos.
Además de lo anterior, el Tribunal de Primera Instancia especificó en su dictamen que, para determinar los ingre-sos de la señora Llorens, no consideró las sumas de dinero que ésta recibió como préstamos tomados a amigos y familiares. De otra parte, para determinar el ingreso neto anual, el tribunal dedujo los pagos anuales por contribucio-nes sobre ingresos, según las planillas presentadas, y las otras deducciones autorizadas por la ley. El foro primario *1013 concluyó que las cantidades resultantes concordaban con los gastos del hogar estipulados por las partes.(2)
Según lo expuesto, el Tribunal de Primera Instancia de-terminó las sumas de la pensión alimenticia que debía sa-tisfacer el señor Mora para el periodo comprendido desde el 4 de marzo de 1996 hasta el 31 de noviembre de 1999. La pensión para cada uno de los años de este periodo quedó establecida de la manera siguiente:
1996 — $1,255 mensuales
1997 — $1,151 mensuales
1998 — $1,601 mensuales
1999 — $2,029 mensuales
Las cantidades de pensión indicadas sumaban $69,800.55. El foro primario especificó que de esta suma el señor Mora pagó $55,138.24 y, por lo tanto, la suma adeu-dada era $14,662.31. La señora Llorens solicitó reconside-ración de esa determinación.(3) En reconsideración, el Tribunal de Primera Instancia impuso al señor Mora el pago de $5,000 por honorarios de abogado.
Inconforme aún, la señora Llorens acudió al Tribunal de Apelaciones.(4) Ante este foro argüyó que el Tribunal de *1014 Primera Instancia erró al emitir una sentencia carente de determinaciones de hecho y conclusiones de derecho. Ade-más, adujo que el tribunal de instancia erró al imputarle ingresos por el refinanciamiento de un préstamo hipoteca-rio garantizado con los inmuebles que constituían su hogar. De otra parte, indicó que el foro primario erró al no reconocer como gastos ordinarios y necesarios de los nego-cios de alquiler de inmuebles y de la venta de ropa, aque-llos que identifica como tales el Código de Rentas Internas de Puerto Rico. Argüyó, además, que el Tribunal de Pri-mera Instancia fijó unos honorarios de abogado poco razo-nables para un proceso litigioso que se extendió por diez años. El Tribunal de Apelaciones confirmó la sentencia re-currida en todos sus aspectos, pues resolvió que no proce-día intervenir con las determinaciones del foro primario.
De esa sentencia, la señora Llorens acudió ante este Foro mediante un recurso de certiorari. En síntesis, aduce que el Tribunal de Apelaciones erró al sostener que proce-día imputarle como parte de sus ingresos la suma que ob-tuvo producto del refinanciamiento de un préstamo hipote-cario, pues esta suma no constituye un ingreso. En segundo lugar, arguye que el Tribunal de Apelaciones debió reconocer como gastos ordinarios y necesarios, para el arrendamiento de inmuebles y de la venta de ropa, los gas-tos reconocidos y aprobados como tales por el Código de Rentas Internas de Puerto Rico. Por último, argumenta que los honorarios concedidos por el foro de instancia son irrazonables, considerando que este litigio se extendió por un periodo de diez años.
Por su parte, el señor Mora indica que el Tribunal de Primera Instancia no erró al considerar “$72,000 capitali-zado por refinanciamiento de dos inmuebles” para calcular los ingresos de la señora Llorens. Argumenta que esta ca-pitalización constituyó una variable más al determinar la capacidad económica de la señora Llorens y que ello no implica que el foro primario considerara como un ingreso *1015 de ésta el dinero obtenido a préstamo por el refinancia-miento de los inmuebles que constituían su hogar. Expone que el préstamo hipotecario fue el instrumento que le per-mitió al foro primario cuantificar el “equity o incremento en valor de los inmuebles”, para luego imputarle ingresos a la señora Llorens por su “capital o patrimonio” total.
En cuanto al segundo asunto planteado, el señor Mora aduce que el Tribunal de Primera Instancia adjudicó que la señora Llorens no incurrió en los gastos que ésta alega y que tal determinación merece deferencia. De otra parte, señala que el proceso administrativo referente a las plani-llas de contribución sobre ingresos, y los gastos allí infor-mados, no obligan al Tribunal de Primera Instancia. Ar-guye que la señora Llorens no sustentó los gastos informados en las planillas de contribución sobre ingresos al no presentar prueba de éstos ante el foro primario. En ese tenor, señala que, aunque las partes estipularon la au-tenticidad de las planillas de contribución sobre ingresos presentadas por la señora Llorens, no se estipuló su contenido.
Por último, el señor Mora expone en su alegato que los honorarios fijados por el Tribunal de Primera Instancia son razonables. Afirma que a pesar de que el caso estuvo pendiente ante ese foro por diez años, sin que se fijara una pensión, la dilación fue ocasionada por la parte deman-dante y por el propio tribunal.
Tras examinar los argumentos de ambas partes, proce-demos a resolver.
I — i I — i
A. El caso ante nuestra consideración presenta, nueva-mente, una controversia concerniente a la obligación jurí-dica del padre y de la madre de prestar alimentos a sus hijos menores. Esta obligación es independiente de que és-tos ostenten la patria potestad o vivan en compañía del *1016 menor. Chévere v. Levis, 150 D.P.R. 525, 539 (2000). Véase, además, Martínez v. Rodríguez, 160 D.P.R. 145, 151 (2003).
En múltiples ocasiones hemos expresado que existe un alto interés público en asegurar el cumplimiento con el referido deber, toda vez que el derecho de los menores a recibir alimentos es consustancial a su derecho a la vida. Chévere v. Levis, supra, pág. 535. Véanse, además: Martínez v. Rodríguez, supra, págs. 150-151; Argüello v. Argüello, 155 D.P.R. 62, 69-70 (2001), y casos allí citados. Así, hacer viable que los padres cumplan con su responsabilidad de contribuir a la manutención de sus hijos, es el propósito de la legislación y reglamentación concerniente al sustento de los menores, mediante la cual se han pautado los principios y procedimientos que regirán la fijación de la pensión alimenticia. Martínez v. Rodríguez, supra, pág. 152.
En primer lugar, la fijación de una cuantía de alimentos está guiada por el principio, prescrito en el Art. 146 del Código Civil, 31 L.P.R.A. see. 565, que exige que la pensión alimenticia se establezca en proporción “a los recursos del que los da y a las necesidades del que los recibe”. Véase Martínez v. Rodríguez, supra, pág. 153. Es decir, el criterio rector para determinar una pensión alimenticia es que ésta sea proporcional a los recursos económicos del alimentante y a las necesidades del alimentista. Id. Así, pues, hemos indicado que “[l]a determinación de la cuantía de los alimentos corresponde al prudente arbitrio [del juzgador]”, quien debe velar por que la cuantía que se establezca cumpla con el principio de proporcionalidad. Guadalupe Viera v. Morell, 115 D.P.R. 4, 14 (1983).
Partiendo del susodicho principio de proporcionalidad es que se han adoptado, por vía estatutaria y reglamentaria, guías más precisas para dirigir la difícil labor de determinar la capacidad económica con que cuentan los padres y las madres para suplir las necesidades de sus *1017 hijos. En ese tenor, la Ley Núm. 5 de 30 diciembre de 1986, según enmendada, 8 L.P.R.A. sec. 501 et seq., conocida como la Ley Orgánica para la Administración del Sustento de Menores (Ley Núm. 5), prescribe ciertas normas que rigen el proceso para fijar la pensión alimenticia. El propó-sito primordial de estas normas es que se logre establecer una pensión “justa y razonable” para el beneficio del menor alimentista. Art. 4 de la Ley Núm. 5 (8 L.P.R.A. see. 503). Véase, además, Martínez v. Rodríguez, supra, págs. 152-154. Siguiendo las normas establecidas en la Ley Núm. 5, se promulgaron las Guías para Determinar y Modificar Pensiones Alimentarias en Puerto Rico, Reglamento Núm. 4070 del Departamento de Servicios Sociales, 8 de diciembre de 1989 (Guías de 1989).(5)
En Martínez v. Rodríguez, discutimos el proceso evaluativo establecido en la Ley Núm. 5 y en las Guías de 1989 para determinar la capacidad económica del alimentante(6) y lograr fijar una pensión alimenticia razonable, a la luz de los recursos de éste y de las necesidades del alimentista. En síntesis, este procedimiento requiere que se determine el ingreso bruto del alimentante para luego establecer su ingreso neto. íd., pág. 156. Además del ingreso neto, se considerará el capital o patrimonio total del alimentante para fijar la pensión alimenticia que éste debe satisfacer. Art. 19 de la Ley Núm. 5 (8 L.P.R.A. see. 518). Véanse, además, Martínez v. Rodríguez, supra, pág. 156 esc. 12; S. Torres Peralta, La Ley de Sustento de Menores y el derecho alimentario en Puerto Rico, San Juan, Pubs. STP, 2007, T. 1, pág. 8.06.
*1018 Como parte del proceso evaluativo, es necesario determinar tanto la capacidad económica del padre o la madre no custodio, como la del padre o de la madre custodio, toda vez que ambos están obligados a prestar alimentos de forma proporcional a sus recursos. López v. Rodríguez, 121 D.P.R. 23, 29 (1988), citando a Vega v. Vega Oliver, 85 D.P.R. 675, 679 (1962). En lo que respecta al padre o a la madre custodio,(7) el Art. 19 de la Ley Núm. 5, supra, dispone que para determinar su capacidad económica, “y el cómputo proporcional a serle imputado”, deben considerarse criterios iguales que los utilizados para fijar la capacidad económica del padre o la madre no custodio.
Según expusimos previamente, el caso ante nuestra atención concierne a la aplicación del proceso evaluativo para determinar los ingresos de la señora Llorens como madre custodio. Particularmente, la señora Llorens aduce que no debió agregarse como parte de sus ingresos el dinero que obtuvo por un préstamo que realizó en 1997, el cual estaba garantizado con una hipoteca constituida sobre el inmueble en el que residía junto a sus hijas. Además, arguye que al calcular los ingresos que recibió por el arren-damiento de sus propiedades y por la venta de ropa, debie-ron considerarse y descontarse como gastos necesarios para producir tales ingresos, aquellos que informó en las planillas de contribución sobre ingresos.
Examinaremos, primeramente, si el foro recurrido erró al confirmar la determinación del Tribunal de Primera Ins-tancia de incluir “$72,000 capitalizado por [el] refinancia-miento de dos inmuebles” como un ingreso de la señora Llorens. Tal controversia requiere referimos a la definición de ingreso bruto incluida en la Ley Núm. 5.
B. Tal y como señaláramos, “[l]os conceptos de ingreso bruto y de ingreso neto [según definidos en la Ley *1019 Núm. 5] son esenciales en materia de la determinación de la pensión alimentaria a ser establecida o modificada para beneficio de la parte alimentista”. Torres Peralta, op. cit, pág. 8.05. Véase Martínez v. Rodríguez, supra. Ello porque, según adelantamos, el primer paso para determinar la ca-pacidad económica del alimentante es calcular su ingreso bruto, el cual, al amparo del artículo 2(16) de la Ley Núm. 5 (8 L.RR.A. sec. 501(16)),(8) incluye
... cualquier ganancia, beneficio, rendimiento o fruto deri-vado de sueldos, jornales o compensación por servicios perso-nales, ...; o de profesiones, oficios, industrias, negocios, comer-cio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso del interés en tal propiedad; también los derivados de intereses, rentas, divi-dendos, beneficios de sociedad, valores o la operación de cual-quier negocio explotado con fines del lucro o utilidad; y ganan-cias, beneficios, rendimientos, fondos, emolumentos o compensación derivados de cualquier procedencia, incluyendo compensaciones como contratista independiente, compensa-ciones por desempleo, compensaciones por incapacidad, bene-ficios de retiro y pensiones o cualquier otro pago que reciba un alimentante de cualquier persona natural o jurídica.
Luego de determinar el ingreso bruto, según éste se conceptúa en la definición transcrita, procede calcular el ingreso neto restando del ingreso bruto las deducciones mandatorias establecidas por la ley. Martínez v. Rodríguez, supra, págs. 155-157. Así surge del Artículo 2(17) de la Ley Núm. 5, 8 L.P.R.A. see. 501(17), que define el ingreso neto como “[a]quellos ingresos disponibles al alimentante, luego de las deducciones por concepto de contribuciones sobre ingreso, seguro social, y otras requeridas mandatoriamente por ley”.(9) Véase, además, el Artículo 5(B)(1) de las *1020 Guías de 1989. De otra parte, el citado artículo indica que “[l]a determinación final [sobre el ingreso neto] se hará según toda la prueba disponible, incluyendo estimados, es-tudios y proyecciones de ingresos, gastos, estilo de vida y cualquier otra prueba pertinente”.
Tal y como hemos expuesto, establecer el ingreso bruto constituye el primer paso que se ha de seguir para deter-minar el ingreso neto y la capacidad económica con que cuentan los obligados a prestar alimentos. Al expresarse sobre la definición de “ingreso bruto” incluida en la Ley Núm. 5, Torres Peralta enfatiza que este es un concepto abarcador, que debe interpretarse ampliamente de forma tal que, en la determinación inicial de lo que constituye ingreso, se consideren “todos los emolumentos que recibe el alimentante, sin exclusión alguna[,] ... independiente-mente de cu[á]l es la fuente de la que provienen los ingre-sos del alimentante”. Torres Peralta, op. cit, pág. 8.14.(10) Esta interpretación extensiva del concepto ingreso res-ponde al propósito de la Ley Núm. 5 de asegurar el bien-estar del menor alimentista y el derecho de éste a recibir los alimentos en proporción a sus necesidades y a los re-cursos reales de quienes están obligados a brindarle alimentos. Así, el Artículo 3 de la Ley Núm. 5 (8 L.P.R.A. sec. 502), establece que las disposiciones de esta ley deben interpretarse liberalmente a favor de los mejores intereses del menor que necesita alimentos.
*1021 A la luz de lo anterior, nos corresponde interpretar la definición de “ingreso bruto” incluida en la Ley Núm. 5 para determinar si la señora Llorens generó un ingreso por el “refinanciamiento” de los inmuebles que constituían su hogar. Toda vez que esta controversia implica un préstamo, garantizado con ciertas propiedades inmuebles, es perti-nente considerar algunos aspectos básicos referentes a esta obligación contractual.
Específicamente, el Artículo 1631 del Código Civil, 31 L.P.R.A. see. 4511, prescribe que mediante este contrato,
... una de las partes entrega a la otra, o alguna cosa no fungible para que use de ella por cierto tiempo y se la de-vuelva, en cuyo caso se llama comodato, o dinero u otra cosa fungible, con condición de [de]volver otro tanto de la misma especie y calidad, en cuyo caso conserva simplemente el nom-bre de préstamo.
De otra parte, el Artículo 1644 del Código Civil, 31 L.P.R.A. sec. 4571, expone que “el que recibe en préstamo dinero u otra cosa fungible, adquiere su propiedad, y está obligado a devolver al acreedor otro tanto de la misma especie y calidad [de lo recibido]”. El contrato de préstamo implica esencialmente un “aspecto obligacional, conformado por el compromiso de devolver otro tanto de la misma especie y calidad”. J.L. Concepción Rodríguez, Derecho de Contratos, Barcelona, Ed. Bosch, 2003, pág. 375.
Así, resulta necesario considerar si, para efectos de la Ley Núm. 5, lo recibido por un contrato de préstamo cons-tituye un ingreso, independientemente de que esté pre-sente la obligación de restitución. En relación con esta con-troversia conviene referirnos, sólo a modo ilustrativo, a la interpretación sobre la definición de ingreso bruto de la Ley Núm. 91 de 29 de junio de 1954, según enmendada, conocida como Ley de Contribuciones sobre Ingresos de *1022 1954,(11) toda vez que esta definición incluía una redacción muy similar a la del concepto ingreso de Ley Núm. 5. Es-pecíficamente, la Sección 22(a) de la Ley de Contribuciones sobre Ingresos de 1954(12) disponía que el ingreso bruto incluiría
... ganancias, beneficios e ingresos derivados de sueldos, jor-nales, o compensación por servicios profesionales ... de cual-quier clase y cualquiera que sea la forma en que se pagaren; o de profesiones, oficios, industrias, negocios, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso o del interés en tal propiedad; también los derivados de intereses, rentas, dividendos, bene-ficios de sociedades, valores o la operación de cualquier nego-cio explotado con fines de lucro o utilidad; y ganancias o bene-ficios e ingresos derivados de cualquier procedencia.
Según expone Genovevo Meléndez Carrucini, la defini-ción citada, adoptada del Código de Rentas Internas Federal de 1939 incluye una enumeración extensa y detallada de partidas que constituyen ingreso. G. Meléndez Carrucini, Ingreso Tributable: Inclusiones y Doctrinas, San Juan, Instituto de Contribuciones de Puerto Rico, 1991, págs. 149-152. Al igual que la definición de ingreso incluida en la Ley Núm. 5, la definición de la Ley de Contribuciones sobre Ingresos de 1954 se redactó en un “sentido amplio y abarcador”. Véase Orsini García v. Srio. de Hacienda, 177 D.P.R. 596 (2009), citando a G. Meléndez Carrucini, In-greso no tributable: exclusiones y doctrinas, San Juan, Ins-tituto de Contribuciones de Puerto Rico, 1994, págs. 57-58. Ahora bien, el lenguaje amplio utilizado por el legislador al definir el ingreso bruto, no implica que pueda otorgársele a ese concepto, acudiendo al principio de una interpretación extensiva, un alcance irrazonable que resulte contrario a la *1023 intención legislativa. Orsini García v. Srio. de Hacienda, supra.
Por ello, a pesar de la amplitud del lenguaje con el cual se define el concepto ingreso bruto, se confrontan con fre-cuencia dificultades “en la caracterización de partidas en cuanto a si son o no ‘ingreso’ ” para fines contributivos. Meléndez Carrucini, Ingreso tributable, op. cit., pág. 152. En ese tenor, Meléndez Carrucini discute que la jurispru-dencia federal es ejemplo de los numerosos debates refe-rentes a la definición de ingreso. Íd., pág. 171. Esta juris-prudencia puede resultar particularmente ilustrativa al interpretar la definición de ingreso bruto incluida en los estatutos sobre contribuciones de Puerto Rico, toda vez que el sistema de tributación de esta legislación se adoptó si-guiendo el modelo estadounidense. Íd., pág. 173.
En lo pertinente a esta controversia, en el contexto con-tributivo, la jurisprudencia federal ha resuelto que lo obte-nido mediante un préstamo no constituye ingreso. En James v. United States, 366 U.S. 213, 219 (1961), el Tribunal Supremo de Estados Unidos reafirmó la norma de que un préstamo no constituye un ingreso al expresar lo si-guiente: “When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, he has received income .... This standard brings wrongful appropriations within the broad sweep of “gross income”; it excludes loans.” (Citas omitidas.) Véanse, además: CIR v. Indianapolis P & L, 493 U.S. 203, 207-208 (1990); Commissioner v. Tufts, 461 U.S. 300, 307 (1983) (“When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer”).
Al igual que lo ha interpretado la jurisprudencia federal, en el ordenamiento contributivo puertorriqueño, el dinero obtenido como préstamo no constituye un *1024 ingreso.(13) Así, en presencia de un pacto para restituir lo recibido, como ocurre en el contrato de préstamo, lo obte-nido no constituye un ingreso tributable. Fernández v. Srio. de Hacienda, 95 D.P.R. 429, 432 (1967)(14) (“El factor más importante en la solución del problema que confronta-mos es la intención con que se efectuaron los retiros, y más concretamente, si al momento de realizarse se tenía o no la intención de reintegrarlos”). Véase Meléndez Carrucini, Ingreso tributable, op. cit., págs. 488-491.
A pesar de que la definición de ingreso de la Ley Núm. 5 incluye una redacción casi idéntica a la Ley de Contribu-ciones sobre Ingresos de 1954, la interpretación del con-cepto ingreso que hemos discutido tiene un carácter mera-mente ilustrativo en lo que respecta a la controversia ante nuestra consideración. El alto interés público de asegurar el bienestar de los menores alimentistas y el derecho de éstos a recibir alimentos, inherente a su derecho a la vida, podría requerir una interpretación aún más abarcadora del concepto ingreso en el contexto de la imposición de una pensión alimenticia.
Así, la interpretación que adoptemos debe ser cónsona con el propósito de la Ley Núm. 5 de asegurar el bienestar *1025 de los menores alimentistas.(15) A su vez, la interpretación del concepto ingreso debe concordar con el principio de pro-porcionalidad que rige la fijación de una pensión alimenticia. Debemos pues resolver si los principios y pro-pósitos de la Ley Núm. 5, así como de la reglamentación aplicable, requieren una interpretación más amplia de la definición de ingreso que la que opera en el contexto con-tributivo, de forma tal que se considere incluido en ese con-cepto el dinero obtenido por un contrato de préstamo. Re-solvemos que no.
Si bien el concepto “ingreso” incluido en la Ley Núm. 5 es abarcador y que requiere una interpretación amplia en favor del derecho del menor alimentista, las inclusiones al amparo de este concepto deben, a su vez, representar ganancias, beneficiós, rendimiento o frutos con los que realmente cuente el alimentante, de forma tal que se establezca una pensión justa y razonable. Adoptar la interpretación de que el dinero recibido a préstamo constituye un ingreso, a pesar de la obligación de restituirlo, implicaría imputar una situación económica irreal al obligado a prestar alimentos y, por lo tanto, ello sería contrario al principio de proporcionalidad imperante en materia de la fijación de alimentos. Consecuentemente, concluimos que no incluir directamente como ingreso el dinero obtenido a préstamo, en el contexto de la aplicación de la Ley Núm. 5, constituye la norma que concuerda con el principio de proporcionalidad que rige en materia de fijación de una pensión alimenticia.
La conclusión a la cual arribamos no lesiona el derecho de los menores alimentistas a obtener una pensión *1026 que se ajuste tanto a sus necesidades como a la capacidad económica del obligado a prestarle alimentos. En ciertas circunstancias, las obligaciones prestatarias del alimen-tante pueden constituir un factor que se ha de considerar para fijar una pensión, si estas obligaciones son indicativas de que éste recibe ingresos mayores a los informados o tiene una capacidad económica mayor a la que alega. Ello es posible, según discutiremos posteriormente, mediante la aplicación de la doctrina de imputación de ingresos.
C. Precisamente, el argumento del señor Mora es que, en este caso, el Tribunal de Primera Instancia acudió a la doctrina de la imputación de ingresos al agregar como un ingreso de la señora Llorens los $72,000 obtenidos por el refinanciamiento de sus propiedades. Expone que no se trata de que el dinero obtéhido a préstamo constituyera automáticamente un ingreso de ésta, sino que el préstamo hipotecario sirvió de instrumento para cuantificar el “equity o incremento en valor” de los inmuebles pertenecientes a la señora Llorens para imputarle ingresos a ésta por su capital o patrimonio total.
Con relación a este planteamiento, primeramente, debe-mos examinar si el aumento en el valor de las propiedades constituye parte del ingreso bruto según la Ley Núm. 5. Sobre este asunto, conviene acudir nuevamente, y a modo ilustrativo, a la norma establecida en el contexto contri-butivo.
Aunque en este contexto el incremento en valor de una propiedad podría calificar como un beneficio, no se considera que se ha recibido o devengado, como tal, un ingreso “hasta tanto el beneficio o la ganancia se realiza”. Meléndez Carrucini, Ingreso tributable, op. cit., págs. 185-186. Lo anterior es resultado de la aplicación de la doctrina de “realización de ingresos” (realization of income), la cual incluye como principio que “[e]l mero incremento en valor de una propiedad, o la expectación de una ganancia, no es *1027 ingreso hasta tanto se dispone de la propiedad o se recibe o devenga el ingreso”.(16) Id., pág. 185.
Meléndez Carrucini explica que, según la doctrina de realización de ingresos, aunque una propiedad aumente en su valor, “no [s]e ha realizado la ganancia que representa el incremento en valor y por lo tanto [el propietario] no tiene que declarar como ingreso dicho incremento en valor ... aunque derive algunas ventajas del nuevo valor aumen-tado de la propiedad”. Meléndez Carrucini, Ingreso tributable, op. cit., pág. 186. Una ventaja sería, por ejemplo, que el propietario tome un préstamo garantizado con hipoteca sobre el inmueble que ha aumentado en valor. Aunque se obtenga una ventaja como ésta, se requeriría la venta o disposición del bien para la realización de la ganancia, lo cual no ocurre al tomar el dinero a préstamo, garantizando la obligación contraída con una hipoteca sobre el bien inmueble. Id. Así, el incremento en valor de una propiedad no implica automáticamente la realización de un ingreso.
Expuesto lo anterior, debemos resolver si, en el contexto de la Ley Núm. 5, supra, la aplicación de la doctrina de realización de ingresos resulta inadecuada al determinar si el aumento en el valor de una propiedad constituye un ingreso. Concluimos que la aplicación de esa doctrina re-sulta apropiada, en este caso, pues sería irrazonable consi-derar directamente como ingreso una ganancia que aún no se ha realizado. Máxime cuando la ganancia alegada se trata del incremento en valor de los apartamentos que constituyen el hogar de la persona custodio y las menores alimentistas. La amplitud de la definición de ingreso in-cluida en la Ley Núm. 5 y la interpretación extensiva que requiere este concepto en beneficio del menor alimentista, no implica que debamos sostener interpretaciones que en *1028 su aplicación contravendrían el principio básico de propor-cionalidad que rige la fijación de pensiones alimenticias.
D. Lo expuesto previamente no significa que el valor de las propiedades de quien está obligado a prestar alimentos o las deudas, y las obligaciones prestatarias en que éste haya incurrido, no puedan considerarse en forma alguna para determinar su capacidad económica. El interés de asegurar que el menor alimentista reciba una pensión justa y razonable, en protección de su derecho fundamental a la vida, exige la consideración de ciertos factores, al determinar la capacidad económica del alimentante, entre los cuales se encuentran los dos criterios mencionados.
De una parte, la Ley Núm. 5 permite que las propiedades con que cuentan los obligados a prestar alimentos se consideren como un factor para lograr establecer una pensión razonable que se ajuste a la capacidad económica de éstos. Según expusimos, previamente, esta ley establece que el “capital o patrimonio” se considerará como un elemento adicional al ingreso neto, para establecer la capacidad económica del alimentante y de la persona custodio. Artículo 19 de la Ley Núm. 5 (8 L.P.R.A. see. 518). Véase, además, Torres Peralta, op. cit., pág. 8.29.
De otra parte, la jurisprudencia de este Tribunal ha resuelto que para determinar la capacidad económica del alimentante y de la persona custodio pueden considerarse ciertos factores tales como: “el estilo de vida que lleva el alimentante, su capacidad para generar ingresos, la naturaleza y cantidad de propiedades con que cuenta, la naturaleza de su empleo o profesión y sus otras fuentes de ingreso.” (Enfasis suplido.) López v. Rodríguez, supra, pág. 33. Véase, además, Argüello v. Argüello, supra, págs. 73-74. Tales factores, según expusimos en Argüello v. Argüello, supra, pág. 74, pueden servir de base para “imputarle ingresos al alimentante razonablemente, más allá de lo que *1029 éste alegue o intente probar sobre el particular”. (Énfasis en el original.)
Específicamente, en Argüello v. Argüello, supra, este Foro resolvió que los gastos mensuales en los que incurre el alimentante constituyen un factor mediante el cual podrían imputársele ingresos, cuando tales gastos sobrepasan los ingresos informados. Sobre este particular, Torres Peralta, op. cit., págs. 9.16-9.17, discute que “[l]os gastos en que incurre el alimentante para sostener su estilo de vida, constituyen un elemento decisivo al determinar cuál es la verdadera situación económica del alimentante”. Por ejemplo, las cuentas altas en tarjetas de crédito podrían constituir un gasto que debe considerarse, aunque luego esas deudas se paguen a plazos. Íd. De igual forma, si el alimentante ha incurrido en obligaciones prestatarias, podrían considerarse tales deudas para imputarle ingresos, cuando sean indicativas de que recibe ingresos mayores a los informados u ostenta una capacidad mayor para generar ingresos.
Por otro lado, en cuanto a la imputación de ingresos por “la naturaleza y cantidad de propiedades” del alimentista, Torres Peralta, op. cit., pág. 9.21, comenta lo siguiente:
La naturaleza y cantidad de propiedades que forman parte del capital del obligado y la productividad potencial de las mismas es criterio de alta importancia. Mediante la utilización de fór-mulas disponibles, se puede convertir el valor de los bienes inmuebles y muebles del alimentante a un valor rental y adi-cionar el resultado a los ingresos del alimentante.
Ciertamente, acudir a ejercicios como los discutidos re-sulta en ocasiones imprescindible para lograr establecer —mediante el mecanismo de imputación de ingresos— la situación económica real del alimentante. No obstante, de la sentencia emitida por el Tribunal de Primera Instancia en este caso no surge que ese foro acudiera a la doctrina de imputación de ingresos —considerando como un factor la *1030 naturaleza y el valor de las propiedades la señora Llo-rens— para atribuirle a ésta ingresos en 1997. Tampoco surge que, al considerar los $72,000 como un ingreso de la señora Llorens, el foro primario lo hiciera por la capacidad de ésta para satisfacer sus deudas u obligaciones prestatarias.
Por el contrario, el Tribunal de Primera Instancia se limitó a establecer en su dictamen que, para 1997, consti-tuían parte del ingreso neto de la señora Llorens “$72,000 capitalizado por [el] refinanciamiento de dos inmuebles”. Es decir, el tribunal determinó que la señora Llorens rea-lizó una ganancia de capital según el “refinanciamiento” de los inmuebles que constituían su hogar. Como consecuen-cia de ello, el ingreso neto mensual de la señora Llorens para ese año ascendió a $8,268.25.
Tal y como hemos determinado, no procede atribuirle automáticamente un ingreso a la señora Llorens por el he-cho del “reñnanciamiento” de los inmuebles que consti-tuían su hogan Ello, porque la obligación de restituir el dinero obtenido por el préstamo impide considerar tal par-tida como parte del ingreso bruto recibido por ésta. De otra parte, aunque el aumento en valor de las propiedades de la señora Llorens fuera el factor que le permitió obtener el “refinanciamiento”, ello no implica que este aumento cons-tituya un ingreso realizado. Por lo anterior, resolvemos que erró el Tribunal de Apelaciones al confirmar la determina-ción del foro primario de incluir como un ingreso de la se-ñora Llorens “$72,000 capitalizado por [el] refinancia-miento de dos inmuebles”.
III
Resuelto lo anterior, procederemos a determinar si al calcular los ingresos que recibió la señora Llorens, por el arrendamiento de varios inmuebles de su propiedad y por la venta de ropa, debieron considerarse y descontarse como *1031 gastos necesarios para producir estos ingresos, aquellos in-formados por ésta en sus planillas de contribución sobre ingresos.
Sobre esta controversia, el Artículo 5(B)(1) de las Guías de 1989 indica que, en el caso de quien trabaje por cuenta propia, el ingreso bruto se determinará: “por un procedi-miento similar al que se utiliza en la planilla de contribu-ción sobre ingresos en donde se toman en consideración los gastos necesarios en que el alimentante haya incurrido para producir su ingreso.”(17) (Enfasis suplido.)
Al amparo del citado artículo, la señora Llorens argu-menta que, para determinar los ingresos obtenidos del ne-gocio de venta de ropa y del arrendamiento de bienes in-muebles, debieron reducirse aquellos gastos que el Código de Rentas Internas permite deducir para fines contributivos. Particularmente, alude a la Sec. 1023(a) 1 del Código de Rentas Internas, 13 L.P.R.A. sec. 8423, la cual prescribe que al computarse el ingreso neto, para efec-tos de una industria o negocio, se admitirán como deduc-ciones “[t]odos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación de [dicha] industria o negocio”. (Énfasis suplido.)
Al discutir el alcance del término “gastos ordinarios y necesarios” en el contexto contributivo, Manuel Tirado Viera expone que “la condición de ‘ordinario y necesario’ en un gasto ha sido una cuestión controvertible”. M. Tirado Viera, Fundamentos de las contribuciones sobre ingreso de Puerto Rico, 2da ed., San Juan, [s. Ed.], 1986, pág. 160. Por un lado, un gasto califica como “ordinario” si éste “prevale- *1032 ce en la comunidad como una práctica en la industria o negocio”. Íd. De otra parte, un gasto califica como “necesa-rio” cuando “ayuda en el desarrollo, fomento y continuidad de una industria o negocio”. Íd. El criterio de necesidad no implica que el gasto deba ser indispensable para el funcio-namiento del negocio, sino que es suficiente una “razonable conexión con el propósito de fomentar la industria o negocio”. Íd., págs. 160-161.
En aplicación del concepto “gastos ordinarios y necesa-rios”, las planillas de contribución sobre ingresos proveen una lista no taxativa para que los contribuyentes informen los gastos operacionales en los cuales han incurrido en el manejo de su industria o negocio. Torres Peralta discute que la enumeración de deducciones contributivas permiti-das por gastos necesarios y ordinarios se extiende “prácti-camente ad infinitum”. Torres Peralta, op. cit., págs. 8.47-8.51. Esta lista incluye, entre otras, deducciones por: gastos de vehículo de motor, gastos de comida y entreteni-miento, materiales, reparaciones, depreciación, reparacio-nes, anuncios, seguros, y gastos de viaje. Íd.
Algunas de esas deducciones podrían resultar super-fluas o injustificadas en el contexto de la imposición de una pensión alimenticia. En ese tenor, Torres Peralta afirma que es insuficiente que cierto gasto se enumere en las pla-nillas de contribución sobre ingresos, y sea informado en éstas, para que deba restarse al calcular el ingreso de un alimentante que trabaja por cuenta propia. Torres Peralta, op. cit., pág. 8.47. Antes bien, expone que sólo deben consi-derarse como gastos necesarios, en la fijación de una pen-sión alimenticia, aquellos “razonables” y “realmente incurridos”. Íd. Coincidimos con tal criterio.
Ciertamente, las Guías de 1989 pautan que para determinar el ingreso bruto de un alimentante que trabaja por cuenta propia se seguirá un “procedimiento similar” al que se utiliza en la planilla de contribución sobre ingresos, “en donde se toman en consideración los gastos necesarios *1033 en que el alimentante haya incurrido para producir su ingreso”. Es decir, las Guías de 1989 indican que se acu-dirá, ilustrativamente, al procedimiento utilizado en las planillas de contribución sobre ingresos para fijar el in-greso bruto del alimentante, en los casos en que trabaje por cuenta propia.
Si bien el proceso que se sigue en el contexto contribu-tivo es ilustrativo al momento de fijar el ingreso bruto en tales casos, ello no implica que un gasto informado en las planillas de contribución sobre ingreso deba reducirse au-tomáticamente en el proceso de fijar una pensión alimenticia. Más aún cuando, en el contexto de fijación de pensiones alimenticias, está en juego el bienestar de los menores alimentistas.
Asegurar el derecho de los menores a recibir alimentos podría requerir una aplicación más restrictiva sobre lo que constituye un gasto necesario en el contexto de la fijación de una pensión alimenticia. Aunque el proceso establecido en el contexto contributivo sirve para ilustrar al foro pri-mario —en la determinación de los gastos que pueden des-contarse al establecer el ingreso bruto de quien trabaja por cuenta propia— el hecho de que un gasto sea deducible en las planillas de contribución sobre ingresos no adjudica que éste sea “necesario” al fijar una pensión alimenticia.
De otra parte, la existencia del gasto invocado por quien está obligado a prestar los alimentos es un asunto que debe ser objeto de prueba ante el foro que ostenta la ardua en-comienda de fijar una pensión alimenticia justa y razonable. Corresponde a este foro aquilatar la prueba pre-sentada para determinar si, como cuestión de hecho, se incurrió en el gasto que se invoca. (18)
*1034 En síntesis, el foro adjudicador debe determinar si en el gasto invocado realmente se incurrió y si, además, es nece-sario a la luz de las circunstancias del caso. En cuanto a este último aspecto debe evaluarse si el gasto se incurrió razonablemente con el interés de fomentar la industria o negocio. El proceso administrativo referente a las planillas de contribución sobre ingresos, y los gastos que allí se in-formen, no resultan obligatorios para el foro que debe fijar una pensión alimenticia.
En este caso, contrario a lo que argumenta la señora Llorens, el Tribunal de Primera Instancia no estaba obli-gado a reducir los gastos que ésta informó para fines contributivos. Tras examinar la prueba presentada, este foro determinó que procedía considerar el ingreso por venta de ropa sin restar los gastos informados por la se-ñora Llorens en sus planillas de contribución sobre ingresos. Igualmente, decidió que sólo procedía restar al-gunos gastos referentes al arrendamiento de propiedades. Esta determinación del foro primario bien pudo responder a que no entendió como probados los demás gastos invoca-dos por la señora Llorens o a que determinó que, a la luz de las circunstancias del caso, esos gastos no resultaban razonables.
El solo hecho de que la señora Llorens informara ciertos gastos en sus planillas de contribución sobre ingresos re-sulta insuficiente para que proceda intervenir con la deter-minación del Tribunal de Primera Instancia sobre este particular. El que no se presentara prueba adicional al res-pecto ante el foro primario, nos impide concluir que la se-ñora Llorens incurrió en los gastos reclamados o que éstos fueron razonables, a la luz de las circunstancias del caso. Ante tal escenario, la determinación del Tribunal de Pri-mera Instancia merece nuestra deferencia. Consecuente- *1035 mente, resolvemos que no erró el Tribunal de Apelaciones al no intervenir con lo resuelto por el foro primario en cuanto a los gastos del negocio de la venta de ropa y al arrendamiento de propiedades inmuebles.
IV
Por último, examinaremos si debemos intervenir con la cuantía de los honorarios de abogado concedida por el foro primario.
La imposición de los honorarios de abogado a favor de los menores, en una acción para reclamar alimentos a favor de éstos, procede sin la necesidad de que el demandado incurra en temeridad, pues esta partida es parte de los alimentos a los que tiene derecho el menor alimentista. Guadalupe Viera v. Morell, supra, pág. 14, y casos allí citados. Véase, además, Torres Rodríguez v. Carrasquillo Nieves, 177 D.P.R. 728 (2009). Mediante el Artículo 22(1) de Ley Núm. 5 (8 L.P.R.A. sec. 521(1)), se incorporó estatutariamente esta norma jurisprudencial al disponerse que, en cualquier procedimiento referente a la fijación de una pensión alimenticia deberá “impon [érsele] al alimentante el pago de honorarios de abogado a favor del alimentista cuando éste prevalezca”.
Así como la cuantía de los alimentos que se fije a favor del menor debe resultar razonable, de igual forma la partida correspondiente a los honorarios de abogado —que es parte de los alimentos a los que tiene derecho el menor alimentista— debe regirse por el criterio de la razonabilidad. Guadalupe Viera v. Morell, supra. Véase, además, Torres Rodríguez v. Carrasquillo Nieves, supra. Como consecuencia de ello, no procede intervenir con los honorarios de abogado que conceda el foro primario, salvo que la suma concedida sea irrazonable.
Ciertamente, la extensión del pleito es un factor que se ha de considerar al fijar los honorarios de abogado a favor *1036 del menor alimentista. No obstante, éste no constituye un criterio único. Pueden existir otros factores, asociados al curso de los procedimientos y las circunstancias del caso en particular, que incidan en el criterio del juzgador en el ejer-cicio de establecer una cuantía de honorarios justa y razonable.
Luego de examinar el expediente ante nuestra conside-ración y analizar los trámites procesales acontecidos ante el Tribunal de Primera Instancia, no estamos en posición de intervenir con la cuantía de honorarios concedida por el foro primario. Confirmamos la determinación del Tribunal de Apelaciones a los efectos de que no procede alterar la suma de los honorarios de abogado que el Tribunal de Pri-mera Instancia estimó razonable a la luz de las circunstan-cias particulares y los trámites acaecidos en el litigio.
V
Tras resolver las controversias planteadas, y por los pro-nunciamientos que anteceden, modificamos la sentencia recurrida, en lo que es incompatible con lo aquí resuelto. Devolvemos el caso al Tribunal de Primera Instancia sólo para que este foro calcule la pensión correspondiente a 1997, excluyendo del ingreso de la señora Llorens los “$72,000 capitalizado por [el] refinanciamiento de dos inmuebles”.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Rivera Pérez y la Jueza Aso-ciada Señora Pabón Charneco disintieron sin opinión escrita.

 En la vista celebrada por el Tribunal de Primera Instancia, la señora Llorens declaró que en 1997 “refinanció” los apartamentos que constituían su hogar para sufragar sus gastos y los de sus hijas, los cuales superaban sus ingresos. Declaró, además, que recibió $94,200 por ese “refínanciamiento”. En la planilla de informa-ción personal de la señora Llorens, presentada el 22 de agosto de 1997, ésta declaró que entre sus pasivos u obligaciones figuraba un préstamo hipotecario, con fecha de julio de 1997, cuyo balance adeudado era $119,000. Además, informó la existencia de *1012 un préstamo hipotecario con fecha de julio de 2007, cuyo balance adeudado era $30,000. Estas obligaciones gravaban los apartamentos G-202 y G-203 del condomi-nio El Monte, los cuales pertenecían a la señora Llorens y constituían el hogar de ésta y sus hijas. Desconocemos el razonamiento mediante el cual el foro primario arribó a la cantidad de $72,000.

 En la sentencia se especificó que los gastos personales imputados al hogar de las menores y de la madre, según lo estipulado por las partes, eran los siguientes:
1996 — $3,424.40 mensuales
1997 — $3,749.93 mensuales
1998 — $3,952.39 mensuales
1999 — $4,107.26 mensuales
1999 — $4,107.26 mensuales

 Además, la señora Llorens solicitó del tribunal determinaciones de hecho y de derecho adicionales, al amparo de la Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. No obstante, la petición se presentó transcurrido el término de diez días aplicable.

 El señor Mora también recurrió de la determinación del foro primario. Entre otros aspectos, éste señaló ante el Tribunal de Apelaciones que el foro primario erró al no imputarle ingresos a la señora Llorens por “el incremento neto en el valor total de su patrimonio” durante el periodo para el cual se estableció la pensión. Asimismo, indicó que procedía imputarle ingresos a la señora Llorens, en los años 1996, 1998 y 1999, según su “nivel de vida”. El Tribunal de Apelaciones consolidó ambos recursos y confirmó la sentencia recurrida. Inconforme, el señor Mora presentó un recurso de certiorari (CC-2007-0773), ante este Foro con planteamientos similares a los esboza-dos ante el foro intermedio. Mediante Resolución de 16 de noviembre de 2007, dene-gamos la expedición de este recurso.

 Las Guías de 1989 quedaron derogadas por las Guías para Determinar y Modificar las Pensiones Alimentarias en Puerto Rico aprobadas mediante el Regla-mento 7135 del Departamento de la Familia, 23 mayo de 2006 (Guías de 2006). Para el periodo objeto de esta controversia aplican las Guías de 1989. Véase Torres Rodríguez v. Carrasquilla Nieves, 177 D.P.R. 728 (2009).

 La Ley Núm. 5 de 30 de diciembre de 1986 (8 L.P.R.A. sec. 501 et seq.) (Ley Núm. 5), en su Art. 2(4), define alimentante como “[c]ualquier persona que por ley tenga la obligación de proveer alimentos y cubierta de seguro médico”. 8 L.P.R.A. sec. 501(4).

 La Ley Núm. 5, en su Art. 2(25), define la “persona custodio” como aquella “que puede ser un padre, madre, pariente o tutor responsable del cuido diario del alimentista y administradora de los bienes de éste”. 8 L.P.R.A. sec. 501(25).

 La definición de “ingreso bruto” de la Ley Núm. 5 se incorporó en el Artículo 5(B)(1) de las Guías de 1989.

 Además, el Artículo 2(17) de la Ley Núm. 5 (8 L.P.R.A. sec. 501(17)), permite que se tomen en consideración otras deducciones “por concepto de planes de retiro, asociaciones, uniones y federaciones voluntarias, así como los descuentos a pagos por concepto de primas de pólizas de seguros de vida, contra accidentes o servicios de *1020 salud cuando el alimentista sea beneficiario de éstos”. Véase Martínez v. Rodríguez, 160 D.P.R. 145, 155-157 (2003).

 El Artículo 7(A)(1)(a) de las Guías de 2006, pág. 11, establece que: “Para determinar el ingreso bruto anual de la persona custodia y de la no custodia se considerarán todas las formas de ingreso incluidas en la definición de Ingreso de [dicho] Reglamento. No se considerarán ingresos, los beneficios provenientes del pro-grama de Asistencia Temporal a Familias Necesitadas (TANF), Categoría C, ni los pagos recibidos al amparo del Programa de Asistencia Nutricional (PAN).” (Enfasis en el original.) Torres Peralta, op. cit., págs. 4.40-4.41 y 8.11-8.13, expone que, según su criterio, las exclusiones de la citada disposición no son de carácter taxativo. Su-giere que, por ejemplo, además de las partidas allí mencionadas los dineros obteni-dos de préstamos estudiantiles sean excluidos del concepto ingreso. Cf., Gilbertson v. Graff, 477 N.W. 2d 771, 774 (1991) (“The excess student loan proceeds are a periodic and reliable source of income”).

 Aunque la Ley de Contribuciones sobre Ingresos de 1954 fue derogada, la definición de “ingreso bruto” del estatuto se mantiene en la Sección 1022 del Código de Rentas Internas de 1994 (13 L.P.R.A. sec. 8422), vigente.

 13 L.P.R.A. sec. 3022.

 Aunque para fines contributivos lo obtenido mediante un contrato de prés-tamo no constituye un ingreso, en algunas circunstancias, cuando parte de la obli-gación del deudor es cancelada puede considerarse que éste recibe ingresos en un monto igual a la porción de la deuda que ha sido cancelada. G. Meléndez Carrucini, Ingreso tributable: inclusiones y doctrinas, San Juan, Instituto de Contribuciones de Puerto Rico, 1991, págs. 213-214. Para una aplicación de lo anterior en el contexto de la fijación de una pensión alimentaria, véase, e.g., In the matter of Timothy Sullivan, 159 N.H. 251 (2009).

 En Fernández v. Srio. de Hacienda, 95 D.P.R. 429, 432 (1967), el deman-dante alegaba que ciertos fondos retirados de una corporación íntima, en la cual éste figuraba como presidente y principal accionista, constituían un préstamo y no el pago de dividendos informales o implícitos. En el caso de que fueran dividendos implícitos, los fondos recibidos constituían un ingreso tributable. Véase, también, Viñas v. Srio. de Hacienda, 97 D.P.R. 282 (1969). Torres Peralta entiende que, igual-mente, en el contexto de la fijación de una pensión alimenticia, un préstamo legítimo a un accionista no forma parte de su ingreso bruto, mas sí constituye un ingreso el pago de dividendos implícitos. Torres Peralta, op. cit., pág. 10.63.

 Véase Torres Peralta, op. cit, pág. 8.31. Véase, además, ilustrativamente, Shearn v. Shearn, 50 Conn. App. 225 (1998), en donde se rechazó adoptar una inter-pretación de ingreso imperante en el ámbito contributivo porque esta interpretación era contraria a lo dispuesto expresamente en la reglamentación aplicable al contexto de la fijación de una pensión alimenticia.

 Nótese que el Tribunal de Primera Instancia aplicó esta norma al incluir como ingresos de la señora Llorens, para 1997 y 1999, las ganancias que ésta obtuvo por la venta de dos inmuebles.

 Las Guías de 2006, en su Artículo 7 A(l)(b), pág. 11, disponen que “[e]n aquellos casos en que la persona custodia o no custodia ejerza una profesión, oficio o conduzca un negocio por cuenta propia, el ingreso bruto se determinará restando a la totalidad de los beneficios económicos obtenidos en el curso del negocio, profesión u oficio, los gastos necesarios en los cuales la persona haya incurrido para obtener tales beneficios”. Nótese que las Guías de 2006 eliminaron la referencia específica al procedimiento de la planilla de contribución sobre ingresos. Torres Peralta, op. cit., pág. 846, expone que el lenguaje utilizado en las Guías de 2006 continúa siendo muy superficial.

 En López v. Rodríguez, supra, pág. 32 esc. 12, mencionamos que al hacer la determinación sobre ingresos, para fijar una pensión alimenticia, también debe to-marse en consideración la economía subterránea que prevalece en Puerto Rico y “que el mayor grado de evasión [contributiva] proviene de personas con negocios propios, seguidos por varios grupos de profesionales y, finalmente por algunos contribuyentes asalariados”. Citando el Informe del Secretario de Hacienda sobre Reforma Contri- *1034 butiva de 1987, págs. 68-69. En iguales términos, en Argüello v. Argüello, supra, pág. 73, expusimos que al fijar la cuantía de pensión “debe considerarse la economía subterránea que prevalece en Puerto Rico y que muchos profesionales y personas con negocios sólo declaran fiscalmente parte de sus ingresos reales”.